## A02A0825. CAMPBELL v. BEAK.
### (568 SE2d 801)

SMITH, Presiding Judge.

Samuel Campbell appeals from the denial of his motion for judgment notwithstanding the verdict ("j.n.o.v.") or, alternatively, for a new trial after a jury verdict and judgment in an action brought against him by David Beak. Campbell raises only two enumerations of error, complaining that the trial court erred in denying both alternatives in his motion, but he argues a number of reasons as to each. We find no merit in any of Campbell's arguments, and we affirm the trial court's denial of Campbell's motion.

Construed to support the jury's verdict, the evidence presented at trial showed that Campbell purchased a 1998 Infiniti Q45 automobile in January 1999 from a dealer in Alabama. The vehicle had been in a wreck and had been totaled by the insurer, and the dealer had bought it at auction. The car had a salvage title. Campbell bought parts himself and had the car repaired. He then had the car inspected so that he could obtain a new title. After failing the first inspection, the car passed the second inspection and Campbell was issued a new, nonsalvage title. Campbell and his wife drove the car for several months and then offered it for sale. He placed an advertisement in the Atlanta Journal and received about 15 calls in response. Beak responded to the ad. He testified that when he asked Campbell "specifically, what was the condition of the car. Had the car ever been wrecked, damaged, or in an accident," Campbell responded that it had not. Beak told Campbell he would get back to him. One other person came out to look at the car, drove it, and made Campbell an offer. That person mailed Campbell a deposit. Before Campbell received the check, however, Beak called again and asked if the car was still for sale. Beak testified that he again asked Campbell

about the car's history and condition. When Campbell told him another person had mailed a deposit, Beak asked him if he would consider selling him the car if he came with a cashier's check before Campbell received the check in the mail from the other interested party. Campbell said he would, and Campbell, Beak, and a co-worker of Beak's met at a service station. Beak testified that he again asked Campbell whether the car had ever been "wrecked, damaged, or in an accident," and Campbell said it had not. Either because Beak noticed that "something looked a little bit off on the paint color" or because Campbell told him that his daughter had a very minor accident, Campbell told Beak that the front bumper had been repainted. This apparently satisfied Beak, and he and Campbell then reached agreement and signed a bill of sale, with Beak paying $34,350 for the car "as is" and Campbell handing over the car and title.

Beak drove the car away and parked it in his garage that night. The next morning he noticed "a slight little leak that appeared to be some type of . . . oily fluid." Over the next ten days, he discovered a few other small problems. He eventually took the car in to a dealer in Roswell and requested that these items be addressed under the car's warranty. The next morning he learned from the dealer that the car's frame had been damaged and the entire front end and several other parts had been repaired and repainted. He immediately called Campbell, who was "very evasive." The dealership subsequently informed Beak that the car was not under warranty because of the amount of damage it had sustained and that it would be "very costly" to repair. At a subsequent visit to a body shop, Beak was told that the car was "dangerous" in its present condition and not repairable. When he could no longer reach Campbell at the phone number he had been given, Beak wrote Campbell a letter asking to rescind the transaction. He received no response. Beak then did some research and discovered that Campbell had bought the car as salvage, that it had failed a first inspection after Campbell had it repaired, but that a new title had eventually been issued.

Beak eventually sold the car to a dealer for $16,500, which was the best offer he received. He then brought this suit against Campbell, alleging fraud and violation of the Fair Business Practices Act ("FBPA" or "the Act"), OCGA §§ 10-1-390 through 10-1-407, and seeking punitive damages, costs, and attorney fees.[1] The trial court ordered the trial trifurcated, with a verdict first being rendered on fraud and violation of the FBPA. In the second phase, if necessary, the jury would indicate whether it found that Campbell's actions

---

[1] The complaint also sought rescission, but Beak admitted at trial that since he sold the car he could not recover on that count.

were intentional, thereby triggering exemplary damages. In the third phase, the jury would decide upon an amount to be awarded if it found that Campbell's actions had been intentional.

Campbell moved for a directed verdict on all counts at the conclusion of Beak's evidence, which was denied. In the first phase of the trial, the jury returned a verdict in favor of Campbell on the fraud claim, and in favor of Beak on the FBPA count in the amount of $15,500. This amount was trebled under the FBPA. In the second and third phases, the jury found that Campbell's actions were intentional and awarded $15,001. Campbell moved for j.n.o.v. or in the alternative for a new trial, which was denied. This appeal followed.

1. Campbell contends his motion for j.n.o.v. should not have been denied because no evidence was presented that the alleged violation of the FBPA was injurious to the consuming public, as required by the Act.

He argues that this transaction did not come within the Act's purview because the violation alleged was not injurious to the consuming public in general, but only to Beak. At trial, Campbell denied that Beak asked him three times whether the car had been wrecked. He testified that Beak asked him only once and that he answered truthfully. He denied making any material misrepresentations to Beak. But he argues that even if a misrepresentation was made, it was made privately to Beak and did not breach any duty owed to the general consuming public, as required by the Act.

> The law is well-settled in Georgia that even though a single instance of an unfair or deceptive act can be a sufficient basis for a claim under the FBPA, that act does not apply to suits based upon deceptive practices which occur in transactions that are essentially private. In other words, unless it can be said that the defendant's actions had . . . potential harm for the consumer public the act or practice cannot be said to have impact on the consumer marketplace and any act or practice which is outside that context, no matter how unfair or deceptive, is not directly regulated by the FBPA.

(Citations and punctuation omitted.) *Borden v. Pope Jeep-Eagle*, 200 Ga. App. 176, 178 (1) (407 SE2d 128) (1991). We cannot agree that Campbell's actions were purely private.

First, Campbell's characterization of his actions ignores the fact that he was engaged in an ongoing practice. Evidence was presented in the first phase of the trial that Campbell had sold a car to at least one other buyer, and evidence of similar deception and similar consequences was presented in the second phase.

Second, evidence was presented that Campbell placed an adver-

tisement in the newspaper. It is obvious, therefore, that he intended to reach the general consuming public. That fact distinguishes this case from *Borden*, supra, and *Burdakin v. Hub Motor Co.*, 183 Ga. App. 90 (357 SE2d 839) (1987), relied upon by Campbell. In both those cases, advertising to the general public was not involved.

2. Campbell correctly notes that *Zeeman v. Black*, 156 Ga. App. 82 (273 SE2d 910) (1980), is the seminal case construing the Act. Campbell points out that in *Zeeman*, this court interpreted the Act

> as requiring that the alleged wrongful act in a "consumer transaction" occur in the context of the on-going business in which the defendant holds himself out to the public. Otherwise, the duty the breach of which is being sued upon would be one owed by the defendant not to the consuming public generally but to the individual "consumer" only. There is insufficient public interest in a single instance in which an owner undertakes to sell his own property to invoke the FBPA.

Id. at 85. He argues that because he testified that he was not in the business of selling cars but only bought and sold them as a "hobby," the transaction in issue did not come within the purview of the FBPA. He points out that he originally bought the Infiniti for personal use, and no evidence was presented that he had employees, a place of business, or a business license or that he filed taxes as a business. We do not agree.

Whether or not he chose to call what he was doing a business or obtain proper licensing, Campbell testified that he enjoys buying damaged cars, having them rebuilt, and selling them. He estimated that since 1993, he has sold "probably around fifteen" cars. He admitted on his deposition that he sells "probably three" cars per year. He also admitted, both on deposition and at trial, that he did not rebuild more than three cars per year or sell more than five and he was "aware of the law" requiring a license to rebuild more than three cars per year or sell more than five for profit. Even if Campbell's transactions were to be considered a hobby, that hobby obviously involved engaging in the business of buying wrecked cars, rebuilding them, and selling them on an ongoing basis. He admitted that he sometimes made "a little bit" of profit on this hobby. Indeed, the profit on the transaction with Beak was approximately $14,500. The jury was properly charged regarding these requirements of the FBPA, and it was authorized to conclude that the transaction that formed the basis of this suit was within the Act's purview.

3. Campbell maintains that a recovery under the FBPA was not authorized because the Act required Beak to have exercised diligence

before purchasing the car from Campbell, which he failed to do. This court held in *Zeeman*, supra, that

> since the Act contemplates notice of the deception relied upon as the prerequisite to a suit for recovery of damages resulting from that deception, we construe [OCGA § 10-1-399] as incorporating the "reliance" element of the common law tort of misrepresentation into the causation element of an individual claim under the FBPA. . . . Therefore, under [OCGA § 10-1-399] when the alleged violation of the FBPA is a misrepresentation, the claimant is not entitled to recover if he had an equal and ample opportunity to ascertain the truth but failed to exercise proper diligence to do so.

(Citations omitted.) *Zeeman*, supra at 87.

But the issue of diligence is a matter for jury determination. *American Petroleum Products v. Mom & Pop Stores*, 231 Ga. App. 1, 6 (2) (497 SE2d 616) (1998). The jury in this case apparently was convinced that Beak was as diligent as the circumstances warranted. Although this conclusion was not demanded, it was authorized by the evidence. The title did not accurately reflect the car's actual history. Evidence was presented that Beak viewed the car himself and test drove it. Beak inquired three times as to its condition and history, and the jury obviously believed that Campbell lied in response. Although the vehicle was sold "as is," that language does not require a different result. *Reilly v. Mosley*, 165 Ga. App. 479, 481 (301 SE2d 649) (1983). Given that nothing placed Beak on notice that he was being deceived, together with the evidence presented concerning the number of Campbell's prior vehicle transactions and the evidence of the complaints of other purchasers, the jury's conclusion on this issue was supported by the evidence.

4. Campbell asserts that Beak's claim under the FBPA must fail because no evidence of damages was presented. He argues that the trial court charged the jury that the measure of damages for the FBPA claim was the difference between the fair market value of the vehicle when Beak purchased it and its fair market value when Beak sold it. Under this charge, Beak was required to prove the vehicle's value, rather than its price. And although purchase price is relevant to value, it is not alone sufficient to show value. *Messmore v. Roth*, 185 Ga. App. 862 (1) (366 SE2d 318) (1988). See also *Denson v. State*, 240 Ga. App. 207, 208 (2) (523 SE2d 62) (1999).

Campbell is correct that the evidence at trial did not meet the standard set in the trial court's charge to the jury. But the trial court did not charge the jury correctly as to the measure of damages. To prevail on a private claim under the FBPA, three elements must be

established: violation of the Act, causation, and injury. *Moore-Davis Motors v. Joyner*, 252 Ga. App. 617, 618-619 (1) (556 SE2d 137) (2001). "This court has consistently held that in accordance with the statutory requirements of the FBPA, the measure of damages to be applied for an FBPA violation is that of actual injury suffered." (Citations, punctuation and footnote omitted.) *Agnew v. Great A & P Tea Co.*, 232 Ga. App. 708, 710 (1) (502 SE2d 735) (1998). The trial court's error was harmless because Beak did present evidence of the correct measure of damages. And the jury's verdict may stand because the evidence presented supports it under the correct standard.

5. Campbell contends that the trial court erred in failing to grant partial j.n.o.v. as to attorney fees because Beak failed to prove his attorney fees. We do not agree.

"An award of attorney fees is unauthorized if appellee failed to prove the actual costs of the attorney and the reasonableness of those costs." (Punctuation and footnote omitted.) *Cannon Air Transport Svcs. v. Stevens Aviation*, 249 Ga. App. 514, 519 (6) (548 SE2d 485) (2001). "It is well established that an attorney may testify as to the reasonableness of his own fee. [Cits.]" *Nichols v. Main Street Homes*, 244 Ga. App. 591, 593 (1) (536 SE2d 278) (2000). Here, Beak's attorney did just that. He stated in his place that he was willing to accept an hourly rate of $150, even though he had twice raised his hourly rate during the course of the case. He stated his hours, and he testified that his fees were more than reasonable, given the complexity of the case, his education, and his experience.

Because Beak recovered on only one of two claims, he would normally be required to separate the hours his attorney put in on the fraud claim from those put in on the FBPA claim. See *SKB Indus. v. Insite*, 250 Ga. App. 574, 578-579 (3) (551 SE2d 380) (2001). In this case, however, the two claims are so similar it would be too difficult to separate the hours spent on each. See generally *Regency Nissan v. Taylor*, 194 Ga. App. 645, 647 (391 SE2d 467) (1990) (FBPA does not require two elements necessary to show common law tort of misrepresentation). Because of the similarity of the two claims and the difficulty of separating them, we conclude that the trial court did not err in allowing Beak to recover for all the hours his attorney spent on the case.

6. In his final argument, Campbell contends the trial court erred in failing to order a new trial because the jury's verdict was internally inconsistent. He argues that it was "inherently inconsistent" for the jury to have found for him on the fraud claim and for Beak on the FBPA claim. We do not agree.

The verdict was not necessarily inconsistent. As discussed briefly above, the FBPA differs from common law fraud in that it eliminates two of the five required elements of fraud: scienter and

intent to deceive. *Taylor*, supra. It is therefore entirely possible that the jury found one of these two elements lacking, yet found that Campbell's actions violated the FBPA. The trial court did not err in declining to order a new trial.

*Judgment affirmed. Eldridge and Ellington, JJ., concur.*

DECIDED JULY 11, 2002 — ▮▮▮▮▮▮▮▮

*Gibson, Deal & Fletcher, John W. Gibson*, for appellant.
*Steven C. Rosen*, for appellee.